RUDOLPH REIMER, Plaintiff, v. WILLIAM G. FULLEN and Others, as Commissioners of the Transit Commission of the State of New York, the LONG ISLAND RAILROAD COMPANY and the CITY OF NEW YORK, Defendants.

Supreme Court, Special Term, Kings County, July 28, 1939.

*Burton A. Zorn* [*Julius Henry Cohen* of counsel], for the plaintiff.

*George H. Stover* [*Frank C. Bowers* of counsel], for the Transit Commission of the State of New York.

*Louis J. Carruthers* [*Otto M. Buerger* of counsel], for the Long Island Railroad Company.

*William C. Chanler, Corporation Counsel* [*Herman Horowitz* of counsel], for the City of New York

STEINBRINK, J. In this action for a declaratory judgment the plaintiff applies for an injunction *pendente lite* restraining the defendants from taking any action pursuant to orders made by the Transit Commission of the State of New York on October 7, 1938, and June 26, 1939, and from interfering with the plaintiff's alleged

rights in and to a siding maintained between the elevated tracks of the defendant Long Island Railroad Company and the coal yard of the plaintiff facing Atlantic avenue, in the borough of Brooklyn, between Van Siclen avenue and Hendrix street.

The orders of the Transit Commission, operation of which is sought to be restrained, direct the elimination of the grade crossings along Atlantic avenue in accordance with a " modified enlarged plan " which provides, among other things, for removal of the existing elevated structure now carrying tracks of the defendant Long Island Railroad Company between East New York and Adkins avenue, and depressing the tracks below the street level for the entire length of the Atlantic avenue division, that is, between East New York and the Morris Park station. With depression of the tracks as planned the plaintiff will be deprived of the siding which now connects the coal yard on his land to the tracks of the Long Island Railroad Company. Plaintiff claims to enjoy a perpetual easement of access to the elevated tracks by means of the existing siding. By virtue of this claimed easement plaintiff asserts the right to have the legality of the Transit Commission's orders determined by a declaratory judgment.

It is the plaintiff's contention that the work directed to be done in accordance with the approved " modified enlarged plan " is not authorized by section 14 of article VII of the Constitution of the State of New York, nor by chapter 677 of the Laws of 1928, as amended, and chapter 289 of the Laws of 1939, the constitutional provision and statutory enactments under the authority of which the Transit Commission orders were purportedly made.

Before delving into the merits of this contention it will be necessary to consider certain preliminary objections which have been raised.

(1) It is urged that the venue of the within action should have been laid in the First Department by reason of the fact that the principal office of the Transit Commission is situated in the borough of Manhattan. The court's attention is called to section 879 of the Civil Practice Act, which reads as follows: " Restrictions upon injunction to restrain State officers. Where a duty is imposed by statute upon a State officer or board of State officers, an injunction order to restrain him or them, or a person employed by him or them, from the performance of that duty, or to prevent the execution of the statute, shall not be granted except by the Supreme Court at a term thereof sitting in the department in which the officer or board is located, or the duty is required to be performed; and upon notice of the application therefor to the officer, board or other person to be restrained."

Since many of the duties of the Transit Commission in connection with the Atlantic avenue grade crossing elimination will necessarily be performed in the borough of Brooklyn, the venue may quite properly be laid in the Second Department without doing violence to the statute, the provisions of which are directory at best. (*Schieffelin* v. *Komfort*, 86 Misc. 678; affd., 163 App. Div. 741; affd., 212 N. Y. 520.)

(2) The defendants take the position that since the plaintiff has invoked another remedy, to wit, an appeal to the Appellate Division from the Transit Commission orders, this court should refuse to entertain an action for a declaratory judgment or to grant any preliminary relief therein. The facts with respect to the pending appeal before the Appellate Division are as follows: At the public hearings conducted by the Transit Commission plaintiff interposed various objections to the " modified enlarged plan " under consideration, and among them was the claim that the Transit Commission was powerless to direct removal of the elevated structure and depression of the tracks as an incident to the grade crossing elimination, and that the Constitution and the enabling statutes granted the Transit Commission no authority to charge the State with the so-called incidental improvements contemplated. From the Transit Commission order made on June 26, 1939, and from its previous order dated October 7, 1938, the plaintiff herein appealed to the Appellate Division. The appeal was taken pursuant to section 13 of chapter 289 of the Laws of 1939, which provides that any person aggrieved by an order or decision provided for in this act " may within sixty days after the service of such decision or order appeal therefrom to the Appellate Division of the Supreme Court in the department in which such grade crossing is located, and to the Court of Appeals, in the same manner and with like effect as is provided in the case of appeals from an order of the Supreme Court."

While inclined to the belief that the statutory remedy is exclusive (see *Matter of Rusk* v. *Public Service Commission*, 164 App. Div. 917; affd., 213 N. Y. 701), it is not necessary to pass directly on the question in view of the rule that a court may not entertain jurisdiction of an action for a declaratory judgment when another action between the same parties, in which all the issues could be determined, is actually pending. (*Woollard* v. *Schaeffer Stores Co., Inc.*, 272 N. Y. 304, 311.) Plaintiff seeks to escape the force of this rule by citing *Socony Vacuum Oil Co., Inc.*, v. *City of New York* (247 App. Div. 163; affd., 272 N. Y. 668) and *Dun & Bradstreet, Inc.*, v. *City of New York* (276 id. 198), both of which hold that the existence of other remedies, such as a review of the taxing authorities by

certiorari, does not preclude an action for a declaratory judgment where such action is begun because of extraordinary circumstances. In neither of these cases was there any proceeding pending at the commencement of the declaratory judgment action, and it is doubtful whether jurisdiction would have been entertained had certiorari proceedings been previously instituted.

The plaintiff asserts that the pending appeal does not afford the more complete remedy available to him in this action, *first*, because the defendants City of New York and Long Island Railroad Company are not parties to the appeal, and *second*, because the issue before the Appellate Division will be confined to the validity of the Transit Commission orders, while in this action the plaintiff may obtain a broad declaration with respect to any contemplated grade crossing elimination project which might affect his rights.

While the defendants City of New York and Long Island Railroad Company are not formal parties to the appeal, their interests in the orders appealed from are so directly and intimately affected that it would be unreal to consider them strangers to the proceeding. Plaintiff must have realized this for he was careful to serve notices of his appeal on the corporation counsel and on the attorney for the railroad. Both the City of New York and the Long Island Railroad Company, represented by counsel, took an active part at the hearings before the Transit Commission, which preceded issuance of these orders. The order of October 7, 1938, specifically directs the Long Island Railroad to join with the City of New York in carrying out the enlarged plan under the supervision of the Transit Commission. Furthermore, it will be necessary for the Appellate Division to pass upon the plaintiff's claimed perpetual easement to determine whether he is a party aggrieved within the meaning of the statute.

The assertion that the plaintiff will not be able to obtain as broad a declaration of his rights on appeal from the Transit Commission's orders as he might obtain by a declaratory judgment does not quite square with the facts. The issue before the Appellate Division is whether the Transit Commission exceeded its authority in approving the " modified enlarged plan " and in directing that the grade crossing elimination project be carried out in accordance therewith. The precise issue is tendered by the complaint now before the court.

The claim that temporary relief here requested may not be obtained from the Appellate Division pending appeal from the Transit Commission orders seems lacking in merit, for, without regard to any statutory provision, the Appellate Division, as an incident of its appellate jurisdiction, has the power to stay the

operation of orders appealed from. (*Hardie* v. *Begrisch,* 208 App. Div. 314.)

The extraordinary circumstances contemplated by the *Socony* and *Dun & Bradstreet* cases are not here apparent, even though it be assumed that these decisions are at all applicable where a remedy other than a declaratory judgment has actually been invoked.

(3) The defendants urge further that no legal rights of the plaintiff are being infringed and that consequently injunctive relief may not be granted as his behest. It appears that in June, 1881, the plaintiff's father and predecessor in title entered into an agreement with the commissioners of highways of the town of New Lots, which reads in part as follows: " Witnesseth that for and in consideration of the sum of one dollar to them paid and in consideration of a deed to the roadway hereinafter mentioned, made executed and delivered the day and year above written, the receipt of which is all hereby acknowledged, the said parties of the first part have agreed and do hereby agree to permit the said party of the second part, to lay a track or crossing for switching from a point on Atlantic Avenue east of Smith Avenue to and over the sidewalk and roadway on the southerly side of Atlantic Avenue in said town of New Lots from the track of the Long Island Railroad to the gateway or entrance leading to the yard of the said Rudolph Reimer, and to maintain the same for himself, his assigns and successors, upon the following express conditions and undertakings hereby assumed by the party of the second part, his assigns and successors, that is to say: The party of the second part hereby agrees to pave the roadway crossed by such track so as to make the same convenient and safe for the use of wagons, carriages and other vehicles; also to finish the sidewalk crossed by said track so as to make the same and every part thereof uniform with the grade of said sidewalk, and allow no projections either of rail or other material to surmount the level of said sidewalk causing danger to life or limb." By reason of the foregoing, plaintiff claims a perpetual easement to maintain a track across Atlantic avenue from his property to the existing elevated railroad. Apart from the fact that the authority of the commissioners of highways of the town of New Lots to grant a perpetual private easement over a public street is not clear, the above-quoted language seems to import nothing more than a revocable permit to connect with the railroad at grade.

The plaintiff's siding was constructed and operated originally at the street level until some time in 1903 when, pursuant to a plan promulgated by the board for the Atlantic avenue improvement, a portion of the Long Island Railroad Company roadbed along Atlantic avenue was elevated. A new siding consisting of an over-

head steel turnout from the elevated tracks of the railroad to the plaintiff's property was constructed after permission obtained from the board for the Atlantic avenue improvement. The board was plainly without authority to bind the city to any permanent encroachment on its public streets. Furthermore, any rights which might have passed to the plaintiff's father under the 1881 agreement must, it seems to the court, have been limited by its own terms to a right to connect with the Long Island Railroad Company at grade. With elevation of the tracks in 1903, that right, if found to have existed, was no longer enforcible.

Plaintiff also claims the perpetual right to have the existing siding served by the Long Island Railroad Company. Although the right is said to have been created by agreement, the only document in evidence before the Transit Commission was a letter from the Long Island Railroad Company to the plaintiff's father which reads as follows: " Referring to our several interviews in reference to the matter of turnout for your coal yard, I beg to advise you that this has been thoroughly gone over by Mr. Baldwin with the following result: Mr. Baldwin states that he agreed to carry the turnout to the curb line. This has been done, and it is his decision that the extension of the turnout from the curb line into your property must be arranged for by you without reference to the Long Island Railroad Company. When the turnout is erected and in condition for operation the Long Island Railroad Company will operate it, handling cars to and from your premises." A reading of this letter, it seems, is sufficient to negative the existence of the agreement claimed.

There was introduced into evidence before the Transit Commission two side track and switch connection agreements between plaintiff's tenants and the Long Island Railroad Company which, while perhaps not binding on the plaintiff, shed some light on the nature of the arrangement. Each of these agreements contains the following provision: " Either of the parties hereto shall have the right at any time upon thirty days notice in writing to the other, to discontinue the operation and use of said side track and switch connection and to remove such portion thereof as shall be owned by it."

While not passing directly on the validity of the plaintiff's alleged property rights, enough has been said to indicate that they have not been established with that clarity required on a motion for a temporary injunction.

The real issue in controversy is whether the Transit Commission exceeded its authority in ordering that " the amount and extent of the work and of the cost thereof required to depress the railroad below the surface of the ground and to construct a highway above

the said depressed railroad in the manner indicated on the said ' enlarged plan ' * * * over and above the amount and extent of the work and of the cost thereof required to eliminate all of the said grade crossings, with the exception of the grade crossing at East New York avenue, if made separately and without reference to the said ' enlarged plan ' are incidental improvements rendered necessary or desirable because of the elimination and reasonably included in the engineering plans therefor." (Order of June 26, 1939.) The order was made after hearings conducted in accordance with the requirements of the 1939 Grade Crossing Elimination Act (Laws of 1939, chap. 289). This statute was enacted to carry into effect section 14 of article VII of the Constitution of the State of New York, which, so far as pertinent, provides as follows: " A grade crossing elimination the construction work for which shall be commenced after January first, nineteen hundred thirty-nine, shall include incidental improvements rendered necessary or desirable because of such elimination, and reasonably included in the engineering plans therefor."

Section 3 of the enabling statute, in so far as pertinent, reads as follows: " Any elimination order hereafter made by such commission shall specify incidental improvements, if any, rendered necessary or desirable because of such elimination and reasonably included in the engineering plans therefor."

The question here presented revolves around the meaning of the words " the incidental improvements rendered necessary or desirable because of such elimination, and reasonably included in the engineering plans therefor." More specifically, the question is whether depression of the railroad below the surface of the ground and the construction of a highway above the said depressed railroad in the manner indicated in the " modified enlarged plan " constitutes an incidental improvement within the meaning of the above-quoted constitutional and statutory provision. The language employed is quite general, if not somewhat vague, and presents a problem in construction not free from difficulty. In the circumstances, a brief *resumé* of the history of the Atlantic avenue grade crossing elimination project in its setting with relation to the deliberations of the delegates to the 1938 Constitutional Convention which led to adoption of the grade crossing elimination amendment might be useful.

The State's participation in grade crossing elimination projects had its inception in chapter 754 of the Laws of 1897, which fixed the railroad's share of grade crossing elimination at fifty per cent, dividing the other fifty per cent equally between the State and local governments affected. The statute did not accomplish the

desired result, namely, the elimination of dangerous grade crossings. In 1924 an amendment to the Constitution was proposed authorizing the Legislature to raise by the issuance of bonds the sum of $300,-000,000 to finance the State's share of grade crossing elimination and to extend loans to railroads and municipalities to defray their share of the cost. The equal division of costs between railroads and public authorities was retained. The proposed amendment was approved by the voters in 1925. Because of the continued objections of municipalities to their share of grade crossing elimination costs, the Constitution was further amended in 1927 so as to permit the Legislature to determine the division of costs between the State and municipalities. Pursuant thereto the Legislature reduced the local share of the cost to ten per cent and increased the State's share to forty per cent. (Laws of 1928, chaps. 677, 678.) By a subsequent enactment the State's share was increased to forty-nine per cent and the local share reduced to one per cent. (Laws of 1929, chap 431.) Grade crossing elimination, nevertheless, continued as a lively subject because of the railroads' objection to their proportionate share of the cost, as well as to the inability of municipalities to defray the costs of public improvements planned in connection with grade crossing elimination. The question was debated at the 1938 Constitutional Convention and resulted in the adoption of the present section 14 of article VII, which, among other things, limits the share of the railroads to fifteen per cent of the cost of grade crossing elimination, exclusive of incidental improvements, the cost of which must be borne by the State.

Agitation for the Atlantic avenue improvement began some thirty years ago. In 1924 the Long Island Railroad Company applied to the Transit Commission for hearings with regard to grade crossing elimination along Atlantic avenue, proposing that it be accomplished by an elevation of the depressed tracks. Nothing was done because neither the Transit Commission nor the city would consent to elevation of the tracks and public funds to depress the same were not available. With the enactment of the 1928 enabling act (Laws of 1928, chaps. 677, 678), the Transit Commission reopened hearings on the Atlantic avenue case. At the request of the board of estimate and apportionment the Transit Commission withheld action pending presentation by the city of an " enlarged plan." In May, 1929, the mayor appointed a committee on " Atlantic Avenue Grade Crossing Elimination and Enlarged Plan." The committee recommended a four-track depression of the Long Island Railroad Company tracks between East New York and the Morris Park station. No plan was ever submitted to the Transit Commission because of the belief that the cost to be borne by the city

was prohibitive. In 1937 the mayor appointed a special committee to meet with the Transit Commission and representatives of the Long Island Railroad Company to promulgate a plan for Atlantic avenue. On December 10, 1937, this committee recommended approval of an " enlarged plan " calling for the depression of two tracks from East New York to the Morris Park station and the elimination of certain local stations. The plan was approved by the board of estimate and apportionment on June 16, 1938. Hearings on the proposed " enlarged plan " were begun before the Transit Commission on August 12, 1938. It appears that the hearings were being conducted in anticipation of some action by the Constitutional Convention relieving the city of the burden of depressing the tracks along Atlantic avenue.

The deliberations before the Constitutional Convention must be approached with due regard to the persistent determination among the public bodies concerned to effect the Atlantic avenue improvement, not by lifting depressed tracks but by depressing elevated tracks. But this circumstance, which may provide some clue as to the meaning of the language adopted at the Convention, is by no means determinative, for the history of the State's participation in grade crossing elimination, evidencing a fixed public policy recognizing the paramount need of eliminating danger to life, limb and property occasioned by grade crossings, was likewise given consideration.

What did the Convention understand the language embraced in the proposed amendment to mean? By their very nature, the words adopted are incapable of precise definition. Reasonable men might well differ as to what is or is not " incidental," " necessary," " desirable because of such elimination," and " reasonably included in the engineering plans." Obviously, a determination cannot be made by any rule of thumb. At first blush it would seem that the depression of tracks and the construction of a highway over the depressed tracks at a cost of approximately $17,000,000 is not an improvement incidental to grade crossing elimination costing approximately $7,000,000. And yet a reading of the recorded debates lends considerable color to the claim made by the defendants that the Convention in adopting the proposed amendment, intended thereby to burden the State with the cost of depressing the Atlantic avenue tracks.

The delegates plainly intended to abandon the policy of limiting the State's contributions to grade crossing elimination only. They intended to transfer to the State a burden found to be too onerous for municipalities, namely, the cost of improvements incidental to grade crossing elimination. That they adverted specifically to the

proposed Atlantic avenue track depression project in the debates on the meaning of " incidental improvements " is a matter of record. Depression of the tracks was mentioned by Assemblyman Moffat (Revised Record, New York State Constitutional Convention, 1938, pp. 672, 673), by Commissioner Moses (*supra*, pp. 656, 657), by former Governor Smith (*supra*, p. 884), by Lieutenant-Governor Poletti (*supra*, p. 891), by Senator Fearon (*supra*, pp. 903, 909), and by Commissioner Fertig (*supra*, pp. 879, 1045). Assemblyman Moffat, in desiring to have the State's share of the cost of incidental improvements limited to fifty per cent cited the Atlantic avenue project as an example of an incidental improvement beneficial both to the State and to the municipality (*supra*, p. 877). Commissioner Moses opposed the Moffat proposal on the ground that it would destroy the Atlantic avenue project (*supra*, pp. 878, 879). (See, also, pp. 660, 661, 681, 682.) Despite expressed concern with the scope of the language permitting an interpretation which might impose large burdens on the State for the benefit of municipalities, the proposed amendment was unanimously adopted. The fact of unanimity might have been expressive of a desire to accomplish grade crossing elimination at any cost, or it might simply have indicated that the delegates were satisfied that the implications of the language were not as broad as they feared. While the delegates had in mind depression of the tracks along Atlantic avenue and the approximate cost that would be involved, they could not anticipate every conceivable improvement which might be deemed incidental. It is for that reason, it seems, that Commissioner Moses, in response to a query as to the meaning of the language, said: " Before I do that, let me point out to you that Mr. Moffat does not know what the law is at the present time as to incidental improvements; and neither does anybody else in the State. There is only one decision of the Court of Appeals that bears on this question at all, and that is confusing but indicates generally that incidental improvements can be included. * * * Now, what would happen under this amendment? The very first sentence of it would have to be interpreted not only by various administrative agencies, but by the court. ' The expense of any improvement which is incidental to but not an essential part of a grade crossing elimination.' " (Revised Record of Constitutional Convention, pp. 878, 879.)

For the purpose of a decision herein, it is only necessary to observe that from what has been noted above there is a serious question as to the validity of the constitutional interpretation suggested by plaintiff. This consideration, together with the doubtful features of the plaintiff's claimed property rights and the very serious question as to jurisdiction to entertain this action for a declaratory

judgment, affords no escape from the conclusion that Special Term should not temporarily restrain a project fraught with so great a public interest. This is particularly so in view of the assurance given by the Transit Commission through its counsel, Mr. Bowers, that no work other than grade crossing elimination will be done on the Atlantic avenue project for the next six months.

Accordingly, the motion is denied.

Again it is suggested to all counsel that since there is no serious dispute in the facts, the matter be promptly submitted on the merits, either to Special Term or to an appellate court, in order that this great public improvement might not be hampered by litigation, and in order that an early determination on the merits may be obtained.